**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank McKOY, Defendant-Appellant.**

**No. 84–1085.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 13, 1984.

Decided Sept. 16, 1985.

Gregory C. Diamond, Las Vegas, Nev., for plaintiff-appellee.

Randy Schaffer, Houston, Tex., for defendant-appellant.

Before SCHROEDER, FLETCHER and CANBY, Circuit Judges.

CANBY, Circuit Judge:

A jury in the District of Nevada convicted Frank McKoy of conspiracy to transport stolen goods in interstate commerce, in violation of 18 U.S.C. § 371 and of aiding and abetting the interstate transportation of stolen goods, in violation of 18 U.S.C. §§ 2, 2314. McKoy contends on appeal that several flaws in his trial tainted his conviction. He argues that the trial court erred in permitting a former assistant United States Attorney to testify at trial that the govern-

ment had "an extremely strong case" against him. He also asserts that the trial court should have excluded evidence of his involvement in other transactions in stolen goods; that he did not receive effective assistance of counsel; and that the evidence was insufficient to support the conviction of aiding and abetting. We reverse on the ground that the prosecutor's improper testimony probably denied McKoy a fair trial. We address McKoy's claim of insufficiency of the evidence because of double jeopardy concerns. We also address the admissibility of the "other crimes" evidence to assist the trial court in the event of a retrial.

I

A truckload of toys was stolen from the Tomy Toy Company in Carson, California between June 18 and June 20, 1982. James Greenamyer, one of McKoy's co-defendants, received the stolen toys at a warehouse in Carson on June 20.

Defendant McKoy's subsequent involvement with the stolen goods was established almost entirely by the testimony of Greenamyer and Greenamyer's ex-wife, Judy Mecham. Greenamyer testified that when he learned of the theft, he called McKoy in an effort to sell the stolen toys. He told McKoy that the toys were hand-held "Pac-Man" machines. When Greenamyer later received the toys, he found that they were "Airjammer Roadrammers and Cyclescrammers". According to his testimony, he then had several more phone conversations with McKoy. The two men agreed on a price of $1.25 per case for the toys and arranged to transport them to Nevada in U–Haul trucks the following day.

Greenamyer and Mecham further testified that on June 21, they and an accomplice, Ray Bowen, drove the U–Haul trucks from California to Nevada. On the way, they called Louetta McKoy, the defendant's wife, for instructions on what to do when they reached Las Vegas. Greenamyer testified that Mrs. McKoy told him to leave the trucks in a certain hotel parking lot and to leave Bowen at a motel. When Greena-

myer and his wife arrived in Las Vegas, they left the trucks behind as they had been instructed to do. Greenamyer then contacted McKoy at McKoy's business in Pahrump, Nevada. According to Greenamyer, McKoy told him to bring the truck keys to Pahrump. On the road between Las Vegas and Pahrump, however, Greenamyer and his wife were arrested by F.B.I. agents who had followed them from California. When questioned they implicated McKoy. Subsequently Greenamyer and Mecham pleaded guilty to conspiracy charges and agreed to testify against McKoy.

The defense witnesses—including McKoy, his wife and son, and several employees and associates of the McKoy family's fireworks business—contradicted the story that Greenamyer and Mecham told. They testified that McKoy had been in Washington state during the week of June 20 and 21, checking locations for fireworks stands. They explained the series of phone calls between Greenamyer's home and the warehouse in California, and McKoy's home and business in Nevada, as an effort by Greenamyer to arrange a large purchase of fireworks in McKoy's absence. McKoy testified that he returned to Nevada late in the afternoon on June 21 and spoke to Greenamyer personally when Greenamyer called the fireworks business from Las Vegas. McKoy said that Greenamyer discussed a possible purchase of fireworks on credit, but never mentioned his load of stolen goods.

II

McKoy contends that the trial court erred in permitting certain testimony by a government witness, former assistant United States Attorney Donald Campbell. Campbell originally had been responsible for prosecuting McKoy and his co-defendants. In that capacity he had conducted the plea negotiations with Greenamyer and Mecham. At trial, McKoy's counsel cross-examined Greenamyer extensively regarding his plea agreement. In response, the government called Campbell as a witness

**1210**

to clarify the circumstances surrounding the plea bargain.

Campbell began by explaining the terms of Greenamyer's plea agreement to the jury. The trial prosecutor then asked Campbell to describe his negotiations with Greenamyer and Mecham. Campbell responded:

"In answering your question, I am going to have to tell you what my state of mind was with regard to this. I wanted to make sure that we had as good a case as we possibly could going into the courtroom. I felt that at that time the Government had an excellent case against—

At that point, the defense objected to the former prosecutor's discussion of his opinion of the evidence. The court sustained the objection, but permitted the witness to describe his "state of mind" with respect to the negotiations. The former prosecutor then continued his testimony as follows: "I felt the case was an extremely strong case against all defendants. It was stronger against some defendants than others, but nonetheless, I felt it was a strong case." Campbell went on to tell the court that "Mrs. Greenamyer (Mecham), in my view, was least culpable of all—". Defense counsel asserted a continuing objection to this testimony, and moved for a mistrial. The motion was denied.[1]

 We fail to understand why the former prosecutor gave the jury his opinion that the government had "an extremely strong case" against McKoy. The rule

---

1. The relevant portion of the trial transcript reads as follows:

MR. LIEBERMAN (the trial prosecutor): What went on in this particular negotiation, if you remember?

MR. CAMPBELL (the witness): We returned, as I recall, a two-count indictment against four individuals. As the attorney in charge of the case I was, of course, interested in finding the ultimate source for the goods that were stolen.

In answering your question, I am going to have to tell you what my state of mind was with regard to this. I wanted to make sure that we had as good a case as we possibly could going into the courtroom. I felt that at that time the Government had an excellent case against—

MR. TERRY (defense counsel): Your Honor, I will object and ask the witness to be admonished not to discuss his opinion of the evidence in his attempt to testify.

THE COURT: Well, I guess your opinion of the evidence probably should stay out.

MR. CAMPBELL: All right, Judge Waters.

THE COURT: On the other hand, you did discuss, Mr. Terry, what went on in these negotiations, and part of it, I suppose, would be the state of mind of both individuals. You certainly went into that extensively with regard to Mr. Greenamyer.

See if you can confine yourself to that.

THE WITNESS: All right, Judge.

Let me rephrase some of what I have just said. I felt the case was an extremely strong case against all defendants. It was stronger against some defendants than others, but, nonetheless, I felt it was a strong case. I initiated plea negotiations with the attorneys for Mr. and Mrs. Greenamyer.

I believed that we could come to a favorable disposition of the case without taking it through a jury trial and then going on appeal. We engaged in what is called plea bargaining, which is a very common practice in both state and federal courts. We do it because the guilt may be overwhelming, the evidence may be overwhelming and the defendant may be willing to plead to a lesser charge in order not to consume the time of the Court and the U.S. Attorney's office.

So, I did that with Mr. and Mrs. Greenamyer. I believe that I contacted both Mr. and Mrs. Greenamyer's attorneys around the same time. Mrs. Greenamyer, in my view, was least culpable of all—

MR. TERRY: Your Honor, I am going to continue to object, and I would ask the court for a continuing objection.

THE COURT: To what?

MR. TERRY: To what his opinion was. I would ask for a side bar also, your Honor.

THE COURT: No. We are getting too many side bars.

MR. TERRY: Then I would move for a mistrial, your Honor.

THE COURT: The motion is denied.

MR. TERRY: Very well.

THE COURT: Goodness gracious. Go ahead, sir

MR. CAMPBELL: I believed that Mrs. Greenamyer was the least culpable in this matter, and I believe I approached her around the same time or possibly before. She had agreed to cooperate in exchange for a Rule 11(e)(1)(C) which bound us and the Court to giving her probation in the matter

We then talked to Mr. Greenamyer. Mr. Greenamyer, as I understood it, was given an explanation of the terms of the plea bargain and the weight of the evidence against him. Accordingly, he agreed to cooperate with the Government and to plead guilty to Count 1, which was conspiracy.

that a prosecutor may not express his personal opinion of the defendant's guilt or his belief in the credibility of witnesses is firmly established. *E.g. United States v. Potter,* 616 F.2d 384, 392 (9th Cir.1979), *cert. denied* 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980); *United States v. Davis,* 564 F.2d 840, 866 (9th Cir.1977), *cert. denied* 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978). Although the problem of prosecutorial vouching generally arises during arguments to the jury, it is equally objectionable where a prosecutor speaks to the jury as a witness. *See People v. Arends,* 155 Cal.App.2d 496, 318 P.2d 532 (1958). In the context of this trial, the jury reasonably could have understood the former prosecutor's testimony as an expression of his belief that the government witness, Greenamyer, was telling the truth and the defendant, McKoy, was lying. The government's entire case against McKoy rested on the testimony of Greenamyer and Mecham. Except for the telephone records, no other evidence linked McKoy to the stolen toys. The prosecutor's statement that the case was "extremely strong" necessarily implied that its strength lay in the co-conspirators' testimony.

The prosecutor's implicit comment on the credibility of the government's witnesses was improper here for the same reasons that such statements are generally improper. Hearing the prosecutor vouch for a witness's credibility, the jury might conclude that evidence not produced at trial confirms his opinion. *See United States v. Roberts,* 618 F.2d 530 (9th Cir.1980); *Orebo v. United States,* 293 F.2d 747 (9th Cir. 1961), *cert. denied* 368 U.S. 958, 82 S.Ct. 402, 7 L.Ed.2d 389 (1962). That danger was present in this case. Because the former prosecutor's testimony described his "state of mind" during the plea negotiations with Greenamyer and Mecham, it was clear to the jury that his statements were based on his personal knowledge of the evidence at that time, not on the evidence presented at trial. Even if the jury did not understand the prosecutor to refer to his knowledge of facts outside the record, the jury could have construed his statements of

opinion as "expert testimony" based on his personal knowledge and his prior experience with other cases. *See United States v. Grunberger,* 431 F.2d 1062, 1068 (2d Cir.1970). A jury is especially likely to perceive the prosecutor as an "expert" on matters of witness credibility, which he addresses every day in his role as representative of the government in criminal trials. It may be inclined to give weight to the prosecutor's opinion in assessing the credibility of witnesses, instead of making the independent judgment of credibility to which the defendant is entitled. The prosecutor's characterization of his case as "extremely strong" created that risk.

■ The testifying prosecutor pursued a second line of improper commentary when he expressed his view of the relative culpability of the participants in the conspiracy. In his testimony, the prosecutor noted that he "was interested in finding the ultimate source for the goods that were stolen." Apparently this statement referred to McKoy, who allegedly was the "fence" to whom the thieves sold the stolen property. The prosecutor also told the jury that he wanted to ensure that the government had "as good a case (against McKoy) as we possibly could going into the courtroom." The prosecutor then went on to describe how he had approached Mecham and Greenamyer and offered them plea bargains to secure their cooperation in the case against McKoy. He twice stated his belief that Mecham was the least culpable of the participants in the conspiracy. The unmistakable message of this testimony was that, in the opinion of the former prosecutor, McKoy was the *most* culpable of those involved in the conspiracy, so culpable that the government was willing to make a deal with the defendants who actually stole the property in order to ensure McKoy's conviction. But the prosecutor may not express his opinion of the seriousness of the defendant's crimes before the jury, any more than he may express his opinion of the defendant's guilt. *See United States v. Potter,* 616 F.2d at 392. The prosecutor has inherent credibility and in-

fluence as a spokesman for the United States. *See United States v. Garza*, 608 F.2d 659 (5th Cir.1979). By expressing his opinion of the defendant's moral culpability, he may distort the jury's decision on the question of the defendant's guilt or innocence.

■ The government argues that counsel for McKoy, in his cross-examination of Greenamyer, invited the former prosecutor's testimony about the strength of the government's case and the relative culpability of the defendants. The Supreme Court has recently noted that the prosecution is not entitled to use improper tactics in response to the tactics of defense counsel. *United States v. Young*, — U.S. —, —, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985). Rather, the issue when the prosecutor behaves improperly is whether that behavior, considered in the context of the entire trial, including the conduct of defense counsel, affected the jury's ability to judge the evidence fairly. *Id.* The Court suggested that, where a prosecutor's improper arguments respond to the arguments of the defense, they may serve to "right the scale" of justice. We do not believe that the former prosecutor's statements were necessary to "right the scale" in this case. Although Greenamyer's understanding of what he stood to gain from the plea agreement may have been relevant to the question whether he told the truth on the witness stand, the prosecutor's "state of mind" with respect to the agreement had no such relevance. The prosecutor's opinion that he had "an extremely strong case" against McKoy did not serve to clarify the plea agreement or explain its terms. The prosecutor's opinion that McKoy was the most culpable of the participants in the conspiracy was similarly irrelevant. It did nothing to refute the defense suggestion that the government's witnesses might have lied to obtain favorable treatment from the prosecution.

Having determined that the prosecution has engaged in improper conduct, we must decide whether the prosecutor's behavior amounted to prejudicial error. *United States v. Young*, — U.S. at —, 105 S.Ct. at 1045. Applying a harmless error test, we consider whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial. *Id.* at — n. 10, 105 S.Ct. 1045 n. 10.[2] Taking into account all the circumstances of this case, we cannot conclude that the prosecutor's improper testimony was harmless. As in *United States v. Roberts*, 618 F.2d 530 (9th Cir.1980), we are influenced strongly by the fact that the government's case depended on the credibility of its two chief witnesses, Greenamyer and Mecham. To the extent that the former prosecutor's testimony affirmed their credibility, it directly influenced the jury's decision on the central issue of the trial. Even having heard that testimony, the jury did not find the government's case compelling. The trial took two days. After five hours of deliberation, the jury sent a note to the trial judge informing him that it was deadlocked and unable to reach a verdict. Instructed to continue, the jury deliberated for another two and a half hours, and then sent the court another note asking if it could recommend leniency. The court told the jury that it could only determine the defendant's guilt or innocence. Only then did the jury return a verdict of guilty.

The fact that the improper statements here were presented to the jury as sworn testimony reinforces our conclusion that those statements probably affected the jury's ability to judge the evidence fairly.

**2.** Some Ninth Circuit authority suggests that improprieties in the prosecutor's conduct do not warrant reversal unless the improprieties are "so gross as to probably prejudice the defendant." *E.g. United States v. Mikka*, 586 F.2d 152 (9th Cir.1978), *cert. denied* 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979); *United States v. Parker*, 549 F.2d 1217, 1222 (9th Cir.), *cert. denied* 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). *Compare United States v. Roberts*, 618 F.2d 530, 534–35 (9th Cir.1980) (applying harmless error standard); *United States v. Lyman*, 592 F.2d 496, 499 (9th Cir.1978) (same). We cannot read *Mikka* and *Parker* as applying a more lenient standard for review of prosecutorial misconduct than that provided by the "harmless error" test, nor could we accept such a lenient standard in the face of *Young*.

We have often noted that the trial court may be able to "neutralize" the effect of improper prosecutorial remarks by admonishing counsel to refrain from such remarks or by giving appropriate curative instructions to the jury. *E.g. United States v. Mikka*, 586 F.2d 152, 156 (9th Cir.1978), *cert. denied* 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979). But prejudicial statements by the prosecution usually come before the jury during opening or closing argument. In such cases, the prosecutor's remarks are not evidence, and the jury is so instructed. The jury is further instructed to consider only the evidence in reaching its verdict. In the present case, the prosecutor's remarks *were* evidence, presented to the jury as sworn testimony.

In sum, we believe that in this case "prejudice to the accused is so highly probable that we are not justified in assuming its nonexistence." *Berger v. United States*, 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1934). The former prosecutor's testimony therefore requires us to reverse this conviction.

## III.

McKoy also challenges the admission of Greenamyer's testimony that he and McKoy had dealt in stolen merchandise several times before the transaction that resulted in their arrest. We reach this issue because it is likely to arise again on retrial.

Greenamyer related that he had first met McKoy about three years before the arrest, when Greenamyer was trying to sell a truckload of stolen goods. According to Greenamyer, McKoy agreed to buy the stolen property—which consisted of "mixed merchandise for stores", including shampoo and cheese among other things—and flew from Nevada to California to collect it. The two men then drove rented trucks containing the merchandise back to McKoy's home in Nevada. Greenamyer further testified that "on occasion" over the following three years he had traded stolen property to McKoy in exchange for fireworks from McKoy's business.

Over the defendant's objection, the trial court permitted the jury to hear this testimony. The court admitted the testimony under Fed.R.Evid. 404(b) as proof of the defendant's knowledge that the goods involved in his transactions with Greenamyer were stolen.[3] During the subsequent course of the trial, however, McKoy never claimed that he had planned or participated in the shipment of the stolen goods in good faith, unaware that they were stolen. Instead he contended that he had not participated in any way in a shipment of stolen goods, and that the prosecution witnesses had lied about his involvement in order to obtain a lenient sentence. He now argues, for the first time, that the evidence of his prior criminal acts was not admissible to prove knowledge because knowledge never was a contested issue in the case. He also renews his argument that the prejudicial effect of the evidence substantially outweighed its probative value. *See* Fed.R. Evid. 403.

■ Rule 404(b) prohibits the government from introducing evidence of a defendant's prior crimes to show that the defendant has a bad character and therefore is likely to have committed the crime with which he is charged. *United States v. Bailleaux*, 685 F.2d 1105, 1109 (9th Cir. 1982). By the terms of Rule 404, however, such evidence may be introduced to prove motive, plan, identity, intent, or knowledge. Fed.R.Evid. 404(b). This court has adopted an "inclusionary" approach to Rule 404(b). We permit the admission of any evidence of other crimes or acts relevant to an issue in the trial, except where the evidence proves *only* the defendant's criminal disposition. *E.g. United States v. Diggs*, 649 F.2d 731,

**3.** In order to convict a defendant of conspiracy to commit a crime or of aiding and abetting a violation, the government must show that the defendant had the guilty state of mind required for the substantive offense. *See United States v.* *Andreen*, 628 F.2d 1236, 1245, 1248 (9th Cir. 1980). One element of the crime of interstate transportation of stolen goods is knowledge that the goods are stolen. 18 U.S.C. § 2314.

737 (9th Cir.), *cert. denied* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981); *United States v. Green,* 648 F.2d 587, 591 (9th Cir.1981). The inclusionary approach recognizes that evidence of other crimes may be probative on issues that are not listed specifically in Rule 404.

■ There is no presumption that evidence of other crimes is admissible. Initially the trial court must find that the proffered evidence is relevant to a material issue in the case other than the defendant's criminal character. *United States v. Bailleaux,* 685 F.2d at 1109–10. Even if the evidence is relevant, the court should admit it only if its probative value is not substantially outweighed by the danger of unfair prejudice. *Id.; United States v. Green,* 648 F.2d at 591. The decision is committed to the sound discretion of the trial court. *United States v. Lopez-Martinez,* 725 F.2d 471, 477 (9th Cir.), *cert. denied* —— U.S. ——, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984).

We have not resolved the precise issue that McKoy raises here. We have held that evidence of a defendant's prior criminal acts may be introduced to prove an element of the charged offense only if the existence of that element is a contested issue in the case. *United States v. Powell,* 587 F.2d 443, 448 (9th Cir.1978); *United States v. Coades,* 549 F.2d 1303, 1306 (9th Cir.1977). *But see United States v. Herrell,* 588 F.2d 711 (9th Cir.1978) (in prosecution for possession of a pistol by a felon, evidence of defendant's prior illegal possession of the pistol admitted to prove "receipt", even though the act of possession proves receipt as a matter of law). But it is not clear whether the rule of *Powell* applies here. The government points out that when it presented its case in chief, McKoy had merely pleaded "not guilty"

without specifying what issues he intended to raise in his defense. The defense did not indicate that it did not plan to contest the issue of knowledge. The government therefore argues that evidence of McKoy's prior dealings in stolen goods was properly introduced as proof of knowledge because a bare plea of "not guilty" requires the government to prove each element of the charged crime beyond a reasonable doubt.[4]

■ We do not decide the question whether the evidence of prior crimes was properly introduced to prove the knowledge element of the charged crime, however, because we find that the challenged evidence was admissible to explain the nature of the relationship between Greenamyer and McKoy and to put their transaction in context for the jury. Evidence is deemed admissible under Rule 404(b) on appeal if it is admissible on any ground. *United States v. Green,* 648 F.2d at 592. We have recognized that evidence of prior criminal acts may be relevant in conspiracy cases to show the background and development of the conspiracy. *United States v. Nadler,* 698 F.2d 995 (9th Cir.1983). Other courts have reached similar conclusions. *United States v. Evans,* 697 F.2d 240 (8th Cir.); *United States v. Scholle,* 553 F.2d 1109 (8th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).

As in the last cited cases, the prior criminal transactions here involved both the defendant and a co-conspirator who testified against him. The transactions revealed the nature of the relationship between the co-conspirator, Greenamyer, and the defendant, McKoy. From the opening argument onward, the defense contended that McKoy knew Greenamyer only as a legitimate customer of the fireworks business. It de-

---

**4.** Several other circuits have adopted the government's reasoning in similar circumstances. *E.g. United States v. Gilmore,* 730 F.2d 550, 554 (8th Cir.1983); *United States v. Hadaway,* 681 F.2d 214 (4th Cir.1982); *United States v. Buchanan,* 633 F.2d 423 (5th Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1981). The Second Circuit has suggested that other crimes evidence used to prove criminal intent should not be introduced until the

prosecution's rebuttal case, when the court can determine whether intent is "really" in issue. *See United States v. Danzey,* 594 F.2d 905 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). But the Second Circuit has also held that the defendant must unequivocally concede his criminal intent or knowledge in order to remove an issue of intent or knowledge from the case. *United States v. Mohel,* 604 F.2d 748 (2d Cir.1979).

scribed the nighttime telephone calls between Greenamyer and the McKoy fireworks business as a special effort by the McKoy family to serve a customer that they considered particularly valuable. Greenamyer's contrary testimony about prior trafficking in stolen goods rebutted this defense. The prior transactions also explained why Greenamyer would have solicited McKoy to participate in a similar criminal enterprise. They further explained Greenamyer's testimony that McKoy was willing to buy the stolen property sight unseen. In closing argument, defense counsel suggested that no prudent buyer of stolen goods would pay the thief without having seen the goods. The prosecution quite properly responded to this argument by pointing to the prior transactions between Greenamyer and McKoy as evidence that they could have established some payment arrangement in which the goods were to be exchanged for merchandise from McKoy's business.

McKoy suggests that his prior criminal conduct is not sufficiently similar to the charged crime to meet the threshhold standard of relevance. We disagree. The degree of "similarity" required depends on the purpose for which the evidence of prior crimes is offered in a particular case. *See United States v. Bailleaux,* 685 F.2d at 1110 n. 1. Here McKoy's prior conduct was similar enough to demonstrate that the relationship between Greenamyer and McKoy was that of seller and buyer of stolen property.

We conclude, therefore, that the evidence of prior crimes met the standard of admissibility established by Fed.R.Evid. 404(b). We do not undertake here to determine whether the probative value of such evidence upon retrial would be outweighed by the danger of unfair prejudice within the meaning of Fed.R.Evid. 403. That determination must of necessity be made by the district court, exercising its discretion in light of the circumstances and context existing at the retrial.

## IV

■ Even though we reverse for prosecutorial misconduct, double jeopardy concerns require us to reach McKoy's contention of insufficient evidence. In *United States v. Bibbero,* 749 F.2d 581 (9th Cir. 1984), we stated that because an appellate reversal of a conviction on the basis of insufficiency has the same effect as a judgment of acquittal, the Double Jeopardy Clause would preclude retrial. We therefore concluded that "the existence of other grounds for reversal does not avoid the necessity of reviewing the sufficiency of the evidence." *Id.* at 586. We review a challenge to the sufficiency of the evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

McKoy claims that the evidence against him was insufficient to support a conviction for aiding and abetting interstate transportation of stolen goods. 18 U.S.C. §§ 2, 2314. He contends that he did not assist in the actual transportation of the stolen goods, or receive them; and that his oral agreement to buy the goods, in and of itself, does not establish that he "aided and abetted" their transportation.

■ We hold that the evidence was sufficient to withstand a motion for judgment of acquittal and to require submission of the case to the jury. *See United States v. Talbert,* 710 F.2d 528, 530 (9th Cir.1983), *cert. denied* —— U.S. ——, 104 S.Ct. 733, 79 L.Ed.2d 192 (1984). The crime of aiding and abetting requires a showing that the defendant intentionally associated himself with criminal activity and by his active participation sought to make it succeed. *United States v. Lane,* 514 F.2d 22, 27 (9th Cir.1975); *Grant v. United States,* 291 F.2d 746, 748–49 (9th Cir.1961), *cert. denied* 368 U.S. 999, 82 S.Ct. 627, 7 L.Ed.2d 537 (1962). The prosecution presented plenty of evidence from which a reasonable

jury could conclude that McKoy intentionally participated in the interstate transportation of stolen goods.

 The jury heard testimony that McKoy helped plan how the stolen toys were to be shipped across state lines and delivered in Nevada. Conscious assistance in the planning of a crime establishes the participation necessary for liability as an aider and abettor. *See United States v. Beck,* 615 F.2d 441 (7th Cir.1980) Moreover, the testimony of Greenamyer and Mecham, if believed, indicates that McKoy's agreement to purchase the stolen toys induced the other participants in the conspiracy to transport the toys from California to Nevada. By the terms of the aiding and abetting statute, a showing that the defendant "counseled" or "induced" another to commit a crime establishes the defendant's participation. Since a reasonable jury also could find that McKoy acted with the requisite intent, and that the people he counseled and encouraged proceeded to commit the crime, the jury rationally could convict him of aiding and abetting. *See United States v. Barnett,* 667 F.2d 835, 841–42 (9th Cir.1982).

### V.

We do not reach the defendant's claims of ineffective assistance of counsel because those issues will not recur. As a result of the former prosecutor's testimony we reverse and remand for a new trial.

REVERSED AND REMANDED.